[No. 24536-1-II.   Division Two.   March 30, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS J.D. CHANNON, *Appellant*.

*Thomas Channon*, pro se.

*Linda J. King*, for appellant (appointed counsel for appeal).

*Gerald A. Horne, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

Hunt, A.C.J. — Thomas Channon appeals his convictions and sentences for three counts of first degree assault and one count of first degree unlawful possession of a firearm for shooting at a pursuing deputy sheriff. Channon argues that (1) the trial court erred by admitting medical personnel's hearsay statements and his involuntary statements to police officers and medical personnel; (2) the erroneous admission of an exhibit deprived him of a fair trial; (3) his trial counsel was ineffective; (4) his three assault convictions constitute double jeopardy; and (5) the trial court failed to consider at sentencing whether the assaults arose from the "same criminal conduct" and whether his prior, concurrently served convictions arose from the "same criminal conduct."[1] Finding no error, we affirm.

## FACTS

### I. The Chase

Pierce County Deputy Sheriff Christopher Grant was traveling to Parkland in his unmarked patrol car to "contact a suspect in a burglary." He observed a car parked partially on the roadway, facing oncoming traffic, and a man running from behind a house toward the car. When the car pulled onto the street, Grant followed. The speeding car swerved into oncoming traffic. At the intersection of 108th Street and Ainsworth Avenue, Grant initiated a traffic stop and announced over his loudspeaker, "Police officer. Turn your vehicle off [and] put your hands outside the window." The driver, Channon, opened the door, leaned out, and fired three gunshots at Grant. Grant returned fire.

Grant pursued the car as it sped off. The car stopped in the middle of the roadway near the intersection of 113th

---

[1] Channon filed a pro se supplemental brief that makes these same arguments.

Street and Alaska Street. Channon's passenger ran from the car. Channon got out of the car and "started shooting at [Grant] again," firing "more than once." Again, Grant returned fire. Something struck Grant's finger, and he heard bullets strike his car within 10 inches of his head. The exchange of fire lasted "a few seconds." Channon got back into his car and sped away, with Grant in pursuit.

Channon stopped his car at the intersection of 96th Street and Steele Street, leaned out, and shot at Grant a third time. Again, Grant returned fire. Again, Channon sped away in his car; this time he lost Grant. Grant radioed Channon's license plate number to dispatch.

Bleeding from the back of his leg, Channon drove to his brother's house. Channon told his brother, "I thought I was getting jacked.[2] Turned out it was a policeman. He shot me." Channon asked his brother to take the gun; but he refused, so Channon tossed it over a fence. Channon called his girl friend, who owned the car he had been driving. He told her that he had been shot while "in a shoot out with police" and told her to report her car stolen. Channon "[p]ut something in a pipe and smoked it" before leaving his brother's house in his girl friend's car.

Continuing to elude police, Channon drove the car through a fence at an apartment complex, abandoned it, stole a bicycle, rode it to another building, and entered Ralph Koholokula's apartment, where Yasmine Simpson was inside. She noticed Channon was panicked and bleeding. Saying that gang members or thugs were threatening him, Channon asked for a ride, hid his bloody shirt in the kitchen, and put on one of Koholokula's shirts. As Channon was leaving the apartment, he encountered Koholokula, who had seen Channon "firing up his pipe inside [his] hallway." Koholokula believed Channon "was loaded" and "[d]idn't know where he was." Channon left on foot.

---

[2] Neither the record nor the dictionary provide a definition for the term "jacked," but we believe it to mean "robbed."

## II. Capture and Transport to Hospital

Shortly thereafter, police apprehended Channon. When Detective Gregory Dawson arrived, Channon was lying facedown on the ground in handcuffs, with bloodstains on his leg. Dawson observed that Channon was "[r]elatively alert"; but Dawson thought it was "definitely possible" that Channon was under the influence of a stimulant. Channon gave Dawson his first name, Dawson advised him of his *Miranda*[3] rights, and Channon twice said he understood his rights. Dawson did not ask Channon to waive his rights.

Channon asked Dawson to tell Deputy Sheriff Ed Troyer, who was also at the scene, that he knew him. Troyer came over and talked with Channon "for about five minutes." Channon told Troyer:

> I fu[**]ed up. Things are really bad. . . . [I have] been smoking crack. [I] didn't really know what [I] was doing.

Report of Proceedings at 66. When Troyer asked Channon where he had discarded his gun, Channon directed him to the fence behind his brother's house. They also discussed mutual acquaintances. When Channon saw a media photographer, he indicated he did not want to be photographed. Troyer thought Channon "was under the influence of something."

Dawson accompanied Channon while paramedics transported him to the hospital. Dawson overheard the following conversation: When the paramedic asked Channon whether "the cops were chasing [him]," Channon replied, "Trying to." The paramedic also asked, "Is that who shot you?" and Channon replied, "Yeah."

Dawson remained with Channon at the hospital. In the emergency room, the treating physician asked Channon, "Who shot you?" Channon answered, "The police, I guess." When the physician asked "if [Channon] was shot from the front or the rear," Channon replied, "Front." The physician asked, "So, you were facing him[?]" Channon answered,

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"Yeah, . . . it went in right here."

Dawson told Channon that he had done the right thing by telling police the location of the gun. Channon responded that "he wished he had not done that because the gun . . . was his best bargaining chip." In Channon's hospital room, Dawson questioned him about the day's events. Channon stated that he had stolen the car and the gun and that his passenger was "somebody that he had picked up . . . to smoke crack."

At some point, Channon stopped responding to Dawson's questions. Channon then said that "he did not want anybody else to get in trouble for his mistakes." Dawson agreed. Channon admitted, "I am the one who did the shooting. I am the one who did the driving." When Dawson asked, "Why?" Channon answered, "[I] didn't want to get caught with the dope" and the gun. Channon also volunteered that he was shooting "at the lights . . . [b]ecause [the deputy] was behind them." Channon ceased talking for "some minutes." Then, in response to Dawson's statement that the police were just doing their jobs, Channon said, "It was just a job until somebody like me tries to kill one of you." Dawson observed that Channon appeared alert and conscious but in pain.

## III. PRETRIAL

The next day, while Corrections Officer Gayle Pero was escorting Channon in jail, Pero overheard Channon tell other inmates, "[T]hey say that I shot a cop . . . but I don't remember anything because I blacked out." Channon later told Pero, "That cop was a sh[***]y shot" and "[the cop] wasn't trying to miss and neither was I."

The State charged Channon with three counts of first degree assault, attempting to elude a pursuing police vehicle,[4] and first degree unlawful possession of a firearm. On the date set for the omnibus hearing, Channon's defense

---

[4] The eluding count was dismissed before trial.

attorney sought to withdraw from the case because Channon could not pay his fees and did not want him to continue to represent him. Channon told the trial court, "I don't feel that my best interest is being looked after." The trial court denied Channon's request for substitute counsel when he refused to waive his speedy trial rights in order to provide substitute counsel time to prepare his defense.

The following day, Channon told the trial court he was experiencing a "conflict" because he could not obtain substitute counsel without waiving his speedy trial rights. The trial court rejected Channon's protest and, based on defense counsel's request, ordered Channon to submit to a psychological examination to evaluate his competency for trial in light of an anticipated diminished capacity defense. Psychologist R. M. Hart reported that Channon was competent to stand trial, and the trial court entered a corresponding finding of competency. Over Channon's objection, but in response to defense counsel's request, the trial court continued the trial date two months beyond Channon's speedy trial deadline to enable defense counsel to complete his trial preparation.

## IV. TRIAL

At trial, the State called Channon's passenger, Kimberly Pratt. She testified that on the morning in question, she and Channon had been smoking rock cocaine since about 1:00 or 2:00 A.M., and Channon had dropped her off at a house to buy cocaine. When she returned to the car, Channon drove off and soon Channon exclaimed, "[O]h, sh[**], there is a cop behind us." When the officer made an announcement over his loudspeaker, Channon said, "Fu[**] that sh[**]. I am not going out like that." Channon made a "U-turn" and "shot off a gun" toward the officer three times. Pratt further testified that Channon "didn't act like [he was high]."

Three bystanders witnessed the exchange of fire between Channon and Grant. Betty Chestnut had been near the first

intersection, 108th Street and Ainsworth Avenue; she saw an unmarked police car stop another vehicle and the driver of that vehicle "fire[] twice at the officer into his car." Rachel Walker was near the second intersection, 113th Street and Alaska Street, when she saw Channon, pursued by Grant, and heard "gunshots." At the third intersection, 96th Street and Steele Street, Ralph Hatton saw Channon fire "three to four rounds at a pop" at Grant and then speed away.

During closing argument, defense counsel argued that Channon could not have fired at Grant at the third intersection, 96th Street and Steele Street, because Channon would likely have been out of ammunition and there was no evidence that Channon had reloaded. Defense counsel also argued that Channon lacked intent to inflict great bodily harm and, therefore, was guilty of only two counts of second degree assault.

The jury found Channon guilty of three counts of first degree assault while armed with a firearm, and one count of first degree unlawful possession of a firearm.

## ANALYSIS

### I. Sentencing

#### A. Current Offenses

■ Channon contends the trial court abused its discretion by sentencing him under RCW 9.94A.400(1)(b) and failing to consider whether the three counts of first degree assault constituted the "same criminal conduct" under RCW 9.94A.400(1)(a).[5] Two or more crimes are considered the "same criminal conduct" for sentencing purposes if they (1) require the same criminal intent, (2) are *committed at*

---

[5] If the three assaults had arisen from the same criminal conduct, they would have counted as one crime for sentencing purposes under RCW 9.94A.400(1)(a). *See State v. Tili*, 139 Wn.2d 107, 119-120, 985 P.2d 365 (1999). But serious violent offenses, such as first degree assault, that do not constitute the "same criminal conduct" are considered "separate and distinct criminal conduct" under RCW 9.94A.400(1)(b). *Tili*, 139 Wn.2d at 122.

*the same time and place,* and (3) involve the same victim. RCW 9.94A.400(1)(a) (emphasis added). The absence of any one of the elements prevents a finding of "same criminal conduct." *State v. Vike,* 125 Wn.2d 407, 410, 885 P.2d 824 (1994).

█ █ Although the record contains no express findings on any of these "same criminal conduct" elements, the record clearly reflects that elements one and three are met —same criminal intent and same victim. In issue is whether the assaults were a continuous course of conduct committed at the same time and place or separated by time and occurring in different places.

Division One has held that:

> Because this court does not make factual findings, [it] will treat the trial court's calculation of [the defendant's] offender score as an *implicit determination* that his offenses did not constitute the same criminal conduct. Just as in cases where the trial court explicitly considers the issue, [this court] will not disturb an implicit determination absent abuse of discretion or misapplication of the law.

*State v. Anderson,* 92 Wn. App. 54, 62, 960 P.2d 975 (1998) (emphasis added). We adopt and apply this *Anderson* reasoning here.

█ █ Although the record does not reflect the time lapses between the assaults,[6] the record does show that the assaults occurred at three different places: "[T]here was a distance of eight blocks between the first and second shooting episodes, and a distance of approximately one mile between the second and third shooting episodes." Resp't's Br. at 65-66.[7] The record also establishes definite time breaks between the successive assaults at these three separate locations. Consequently, the assaults do not constitute the "same criminal conduct" under RCW

---

[6] A finding of "same criminal conduct" does not require simultaneity of crimes. *State v. Porter,* 133 Wn.2d 177, 182-83, 942 P.2d 974 (1997).

[7] Although the distances are not included in the record, at oral argument appellate defense counsel accepted the distances recited in the State's brief.

9.94A.400(1)(a). *See State v. Price*, 103 Wn. App. 845, 14 P.3d 841 (2000) (defendant pursued victims' vehicle, firing weapons at two different places at two distinct times).

## B. PRIOR OFFENSES

RCW 9.94A.360(5)(a) provides:

In the case of multiple prior convictions, for the purpose of computing the offender score, count all convictions separately, except:

(i) Prior offenses which were found, under RCW 9.94A-.400(1)(a), to encompass the same criminal conduct, shall be counted as one offense, the offense that yields the highest offender score. The current sentencing court *shall determine* with respect to other prior adult offenses for which sentences were served concurrently . . . . whether those offenses shall be counted as one offense or as separate offenses using the "same criminal conduct" analysis found in RCW 9.94A.400(1)(a), and if the court finds that they shall be counted as one offense, then the offense that yields the highest offender score shall be used.

(Emphasis added.)

Channon claims that the trial court abused its discretion by failing to determine whether his prior convictions for second degree robbery and first degree theft should be scored as one offense. The two crimes occurred on different dates but he was sentenced for both on the same date and the sentences were ordered to run concurrently.

The trial court did not articulate its reason for counting Channon's prior, concurrently served convictions as separate offenses. The record reflects, however, that these offenses occurred on different dates, which, under the *Anderson* rationale, we treat as the trial court's "implicit determination" that these prior offenses did not constitute the same criminal conduct for purposes of calculating Channon's offender score. *Anderson*, 92 Wn. App. at 62.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

879

shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
Affirmed.

MORGAN and BRIDGEWATER, JJ., concur.

Review denied at 144 Wn.2d 1017 (2001).