**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
5/22/2023
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83387-1-I |
| Respondent, | |
| v. | ORDER GRANTING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |
| JUSTIN DOMINIC BELL, | |
| Appellant. | |

Respondent State of Washington moved for reconsideration of the opinion filed on January 30, 2023. Appellant Justin Bell filed a response. The court has determined that respondent's motion for reconsideration should be granted, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that respondent's motion for reconsideration is granted. It is further

ORDERED that the opinion filed on January 30, 2023, is withdrawn and a substitute published opinion be filed.

Smith, C.J.

Díaz, J.                    Coburn, J.

For the current opinion, go to https://www.lexisnexis.com/clients/walawreports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83387-1-I |
| Respondent, | DIVISION ONE |
| v. | |
| JUSTIN DOMINIC BELL, | PUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Justin Bell was charged with first degree assault and drive-by shooting for an attack on his coworker, Freddie Brooks, that occurred shortly after a fistfight between the two. During jury selection, the court denied Bell's request that jurors wear clear face shields rather than nontransparent face masks covering their noses and mouths. Bell contends that this denial violated his right to select an impartial jury. He also asserts that his conviction on both counts violates double jeopardy and Washington's sentencing laws because his charges were based on one underlying act. He raises sufficiency of the evidence and confrontation clause challenges in his statement of additional grounds. Finding no error, we affirm.

## FACTS

Justin Bell shot Freddie Brooks several times on December 14, 2017. Earlier that day, Brooks had argued with Bell, a coworker, over a carpooling payment Brooks owed Bell. As reported by another coworker, their argument

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83387-1-I/2

escalated and "g[ot] kind of pushy." They were told to leave their employer's building and they did, exchanging blows in the parking lot. When the fight ended, the two went their separate ways. Brooks headed to a corner store and then a bus stop with his girlfriend, Briann Jenkins, while Bell went toward his car.

As Jenkins and Brooks crossed the street to the bus stop, Jenkins heard gunshots, quickly ran toward a nearby Value Village store, and hid behind a car. Witnesses later described hearing six to eight shots. When Jenkins looked back, Brooks was crawling on the ground, hit by several bullets. A passing car transported him to the hospital, where he was treated for several potentially life-threatening bullet wounds. He recovered successfully.

Numerous individuals testified to seeing the shooting and the events surrounding it at trial. One witness, a passenger in a nearby car, testified that he heard gunfire while stopped at a light. Looking in the direction of the gunshots, he saw a black four-door sedan driving erratically, swerving through traffic and cutting off other cars.[1] This witness called the police to provide updates as his girlfriend followed the car. A recording of his 911 call in which he describes the first three letters of the license plate, BTB or BGB, was admitted at trial. Another witness who observed the license plate wrote down the last four numbers: 9767. Bell's registered vehicle was a 2017 Hyundai Elantra with the license plate BGB9767.

---

[1] At trial, the witness testified, "I said Saturn at the time. Maybe a Kia. I can't remember."

2

No. 83387-1-I/3

Eyewitnesses who managed to get a look at the shooter were able to match his age and race roughly with Bell's. One witness, peering into the sedan from less than a car-length away, managed to get a quick glimpse and confirmed his age and race. Another witness was able only to get a sense of his race.

Other evidence confirmed the origin of the gunshots. Most significantly, the State introduced video footage depicting the shooting and Brooks's collapse onto the ground.[2] This footage was then supported by eyewitness and forensic testimony and evidence. One witness, the passenger in a car located behind a vehicle he identified as a dark-colored Kia Sorento, saw the shooter's hand stretching out of the vehicle holding a gun. Still another witness, perhaps 10 or 15 feet away from the shooter's car, saw gunfire come from the driver's side window. The police used lasers to reconstruct the flight path of the fired bullets and concluded that they originated in the street.

Bell owned a firearm, a 9 mm caliber Kahr. Casings and bullet holes found at the scene of the shooting matched this caliber. In February 2018, Bell called the Marysville Police Department to report this firearm stolen. According to the police officer who took the call, Bell said he had reached out "in case something was to be done with that pistol" and demonstrated concern that "if a crime [occurred] or the pistol was used inappropriately that it could be associated with him."

---

[2] This footage was not included in the record on appeal, and we must therefore resort to descriptions from trial of what it depicts.

3

No. 83387-1-I/4

The State initially charged Bell with first degree assault.  It later added a count of drive-by shooting.  During jury selection, Bell requested that jurors not wear face masks that obstructed their noses and mouths, a request the trial court denied.  After hearing testimony, the jury convicted Bell of first degree assault with a firearm enhancement and drive-by shooting.  The court sentenced Bell to 171 months in prison, the low end of the standard range, using an offender score that included both crimes.

Bell appeals.[3]

ANALYSIS

Court's Ruling Concerning Face Masks

Bell first challenges the trial court's denial of his request that potential jurors wear face shields rather than face masks during jury selection, a request made so that potential jurors' demeanor would be more apparent during questioning.  He contends that the trial court's ruling violated his right to an impartial jury.  We are not persuaded.

1.  The Purposes and Manner of Jury Selection

The Washington and federal constitutions guarantee a criminal defendant's right to an impartial jury.  WASH. CONST. art. I, § 22;[4] U.S. CONST. amend. VI.[5]  To enforce this right, potential jurors are removed "for cause" where

---

[3] The State also filed a notice of crossappeal.  It, however, assigns no error and does no more than respond to Bell's arguments in its briefing on appeal.

[4] "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury."

[5] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  This protection is applicable to the

4

the court or parties detect bias. RCW 4.44.190. Voir dire, the part of jury selection wherein the parties ask questions and engage in discussion with potential jurors to draw out potential bias, is central to securing the right to an impartial jury. State v. Momah, 167 Wn.2d 140, 152, 217 P.3d 321 (2009). But voir dire is more than just a question and answer session; and the interactions that inform whether the parties request a potential juror's disqualification for cause—and whether the court grants that request—are more than purely verbal. Instead, the parties and the court rely on all the modes by which one person may assess another's credibility, including their demeanor. Uttecht v. Brown, 551 U.S. 1, 2, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007); see also Reynolds v. United States, 98 U.S. 145, 156-57, 25 L. Ed. 244 (1878) ("[T]he manner of a juror while testifying is oftentimes more indicative of the real character of [their] opinion than [their] words.").

Decisions by the trial court about whether to excuse a juror are therefore reviewed for an abuse of discretion by appellate courts, "in part because a transcript cannot fully reflect" all the information conveyed—intentionally or inadvertently—by jurors during voir dire. Brown, 551 U.S. at 17-18 (explaining appellate courts' deference to trial courts concerning jury selection). A trial court abuses its discretion if its decision "adopts a view that no reasonable person would take." State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

---

states via the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 157-58, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

No. 83387-1-I/6

Similarly, the trial courts are vested with "broad discretion" in deciding the manner of voir dire. State v. Brady, 116 Wn. App. 143, 146, 64 P.3d 1258 (2003); see also RCW 2.28.150 ("[I]f the course of proceeding is not specifically pointed out by statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the laws."). The courts' "discretion is limited only by the need to assure a fair trial by an impartial jury." Brady, 116 Wn. App. at 147. The scope of voir dire should be "coextensive with its purpose, . . . 'to enable the parties to learn the state of mind of the prospective jurors.' " State v. Frederiksen, 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting State v. Laureano, 101 Wn.2d 745, 758, 682 P.2d 889 (1984)).

The trial courts' discretion over the manner of jury selection exists in a number of forms. A trial court may, for instance, where a certain line of examination is not calculated to uncover bias, limit the parties' questioning. State v. Bokien, 14 Wash. 403, 410, 44 P. 889 (1896). It may, where other constitutional rights are not at issue, conduct voir dire away from the public view to permit jurors the privacy to more easily express their opinions. See Momah, 167 Wn.2d at 152-53 (addressing conflicts between right to a public trial and right to an impartial jury, and allowing that circumstances may require closure in the name of impartiality). It may also, as the case demands, allot more or less time for voir dire. See Brady, 116 Wn. App. at 147 (court in certain circumstances may "reasonably reduc[e]" amount of time promised for questioning). But this discretion is not boundless. In Brady, to give one example, the trial court abused

6

No. 83387-1-I/7

its discretion when it promised counsel a certain amount of time for voir dire, counsel prepared to ask certain sensitive questions later in that time, and the court shortened the available time without allowing the attorneys an opportunity to adjust to that change.  116 Wn. App. at 147-48.

2.  Jury Selection During the Pandemic

Starting at the beginning of the COVID-19[6] pandemic, Washington courts adopted a variety of strategies to ensure that trial could continue safely.  The Washington State Supreme Court, in an order issued June 18, 2020, required courts to "conduct all [jury trial] proceedings consistent with the most protective applicable public health guidance in their jurisdiction."  Ord. re: Modification of Jury Trial Proc., Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency, No. 25700-B-631, at 3 (Wash. June 18, 2020).[7]  It also ordered courts to inform jurors of steps the court would take to combat spread of the virus, including "face masking."  Ord. re: Modification of Jury Trial Proc. at 2-3.  It explicitly permitted dramatic changes to the usual voir dire procedures, changes that include remote jury selection, stating:

> The use of remote technology in jury selection, including use of video for voir dire in criminal and civil trials, is encouraged to reduce the risk of coronavirus exposure.  Any video or telephonic proceedings must be conducted consistent with the constitutional rights of the parties and preserve constitutional public access.  Authorization for video-conference proceedings under CrR 3.4(d)(1)

---

[6] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

[7] The order exists online at https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Jury%20Resumption%20Order%20061820.pdf [https://perma.cc/S5YJ-BWPR].

No. 83387-1-I/8

> . . . is expanded to include jury selection, though the requirement
> that all participants be able to simultaneously see, hear and speak
> to one another does not require that all potential jurors be able to
> simultaneously see one another.

Ord. re: Modification of Jury Trial Proc. at 3.

Snohomish County Superior Court promulgated a similar order.

Emergency Ord. #15 re: Ct. Operations, No. 2021-7009-31A, In re Response by

Snohomish County Superior Court to the Public Health Emergency in Snohomish

County and the State of Washington (Snohomish County Super. Ct., Wash.

Aug. 10, 2021).[8]  It required "any person" entering a Snohomish County Superior

Court courtroom to wear a mask covering their mouth and nostrils.  Emergency

Ord. #15 re: Ct. Operations at 3.  It permitted "[a] defendant proceeding to jury

trial [to] express his or her preference either for Zoom[9] or in-person jury

selection."  Emergency Ord. #15 re: Ct. Operations at 18.  It further stated:

> Appropriate cloth, surgical, or N-95/KN-95 masks shall be worn by
> all persons in the courtroom.  The Court may require that jurors
> wear N-95/KN-95.  The Court may permit jurors, when being
> questioned during jury selection, to wear a clear mask instead of an
> otherwise appropriate mask.

Emergency Ord. #15 re: Ct. Operations at 19.

In addition to those orders issued by the courts and specifically directed at

court proceedings, the state executive used its emergency powers to require face

masking in various settings.  At the time of trial in this case in October 2021, an

---

[8] The order exists online at https://www.courts.wa.gov/content/public Upload/COVID19_Snohomish/Snohomish%20County%20Superior%20Emergen cy%20Order%2015%20Superior%20Court%20Operations%20August%2010,%2 02021.pdf [https://perma.cc/2QQB-N8KN].

[9] Zoom is a web conferencing platform that is used for audio and/or video conferencing.

order from the secretary of the Washington Department of Health, Order 20-03.6, was in effect. Wash. Sec'y of Health, Ord. No. 20-03.6 (Wash. Sept. 24, 2021), https://mrsc.org/getmedia/5862c24f-a144-4f14-9045-043b9bf9c0dd/ Secretary_of_Health_Order_20-03-6_Statewide_Face_Coverings.pdf [https://perma.cc/B52A-8AVG].[10] That order required "[e]very person in Washington State [to] wear a face covering . . . when they are in a place where any person from outside their household is present." Ord. No. 20-03.6, at 3. It allowed for a number of exemptions, such as while working alone indoors, while outdoors, while engaging in certain types of performance, while eating or drinking, or while engaging in a "transient activity" that required "temporary and very brief" removal of the mask. Ord. No. 20-03.6, at 3-4. None of those exemptions appears to have applied to jury service.

---

[10] It does not appear that either the Department of Health or the Governor's Office maintains these orders online; only some are accessible from official sources. However, the Municipal Research and Services Center, a nonprofit organization devoted to providing resources to local governments in Washington, has collected all permutations of the order at https://mrsc.org/Home/Explore-Topics/Public-Safety/Emergency-Services/Public-Health-Emergencies/Coronavirus-State-Proclamations-and-Guidance.aspx. This collection appears reliable. In particular, its copy of No. 20-03.7 matches the versions of that document that are available from official sources. Compare Wash. Sec'y of Health, Ord. No. 20-03.7 (Wash. Feb. 16, 2022), https://mrsc.org/getmedia/010ed3ae-ace0-46f2-972c-29e2adb9b3d2/Secretary-of-Healt-Order-20-03-7-Amended-Statewide-Face-Covering-2022-02-16.pdf.aspx [https://perma.cc/B56N-A9RK], with Wash. Sec'y of Health, Ord. No. 20-03.7 (Wash. Feb. 16, 2022), https://www.governor.wa.gov/sites/default/files /proclamations/WA_DOH_Secretary_of_Health_Order_20-03.7_Amended_Statewide_Face_Covering_2022.02.16.pdf [https://perma.cc/XVJ6-EXVS].

3. <u>Constitutionality of Masked Jurors During the Pandemic</u>

Washington was not alone in taking these steps to ensure the safety of jurors, court staff, counsel, parties, and the general public during a global health emergency.  Many other jurisdictions did the same.  Some of those jurisdictions have seen challenges to their pandemic-induced jury selection procedures similar to the one Bell brings.  Courts have uniformly rejected these challenges.

Most cases rejecting the argument that requiring jurors to wear face masks during voir dire violates the defendant's right to an impartial jury come from federal district courts.[11]  Only one federal circuit court appears to have addressed the issue so far, also upholding face masking during voir dire.[12]  A number of state courts have also considered and rejected the issue.[13]  No

_____

[11] See <u>United States v. Crittenden</u>, No. 4:20-CR-7 (CDL), 2020 WL 4917733, at *7-8 (M.D. Ga. Aug. 21, 2020) (court order); <u>United States v. Trimarco</u>, No. 17-CR-583 (JMA), 2020 WL 5211051, at *5 (E.D.N.Y. Sept. 1, 2020) (court order); <u>United States v. James</u>, No. CR-19-08019-001-PCT-DLR, 2020 WL 6081501, at *3 (D. Ariz. Oct. 15, 2020) (court order); <u>United States v. Robertson</u>, No. 17-CR-02949-MV-1, 2020 WL 6701874, at *2 (D.N.M. Nov. 13, 2020) (memorandum opinion and court order); <u>United States v. Tagliaferro</u>, 531 F. Supp. 3d 844, 851 (S.D.N.Y. 2021); <u>United States v. Thompson</u>, 543 F. Supp. 3d 1156, 1164-65 (D.N.M. 2021); <u>United States v. Watkins</u>, 18-CR-32-A, 2021 WL 3732298, at *7 (W.D.N.Y. Aug. 24, 2021) (decision and court order); <u>United States v. Maynard</u>, No. 2:21-CR-00065, 2021 WL 5139514, at *2 (S.D. W. Va. Nov. 3, 2021) (memorandum opinion and court order); <u>United States v. Schwartz</u>, No. 19-20451, 2021 WL 5283948, at *3 (E.D. Mich. Nov. 12, 2021) (opinion and court order); <u>United States v. Davis</u>, No. 18-cr-20085, 2021 WL 5989060, at *3 (E.D. Mich. Dec. 16, 2021) (court order).

[12] <u>United States v. Ayala-Vieyra</u>, No. 21-1177, 2022 WL 190756, at *5 (6th Cir. Jan. 21, 2022); <u>United States v. Smith</u>, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021).

[13] <u>Commonwealth v. Delmonico</u>, 251 A.3d 829, 842 (Pa. Super. Ct.), <u>appeal denied</u>, 265 A.3d 1278 (Pa. 2021); <u>Cooper v. State</u>, 2022 Ark. App. 25, at 6, 638 S.W.3d 872 (2022); <u>Collins v. Nizzi</u>, No. 354510 (Mich. Ct. App. Jan. 20, 2022) (unpublished), https://www.courts.michigan.gov/4b0259/siteassets

10

No. 83387-1-I/11

Washington court has yet addressed it.[14]

Several notable patterns emerge from the various courts' treatment of this issue. First, appellate courts reviewing trial courts' decisions to permit potential jurors to wear masks apply an abuse of discretion standard. United States v. Ayala-Vieyra, No. 21-1177, 2022 WL 190756, at *5 (6th Cir. 2022) (unpublished); Commonwealth v. Delmonico, 251 A.3d 829, 842 (Pa. Super. Ct. ), appeal denied, 265 A.3d 1278 (Pa. 2021); Cooper v. State, 2022 Ark. App. 25, at 6, 638 S.W.3d 872 (2022); Gootee v. State, No. 119, slip op. at 23-24 (Md. Ct. Spec. App. Mar. 25, 2022) (unpublished), https://mdcourts.gov/sites/default/files /unreported-opinions/0119s21.pdf [https://perma.cc/YGG3-Q6FD], cert. denied, 479 Md. 465 (2022). This matches the appellate courts' typical deference to trial court decisions concerning the manner of jury selection, described above, and we follow suit.

---

/case-documents/uploads/opinions/final/coa/20220120_c354510_51_354510. opn.pdf [https://perma.cc/9WHM-2LPE]; Gootee v. State, No. 119, slip op. (Md. Ct. Spec. App. Mar. 25, 2022) (unpublished), https://mdcourts.gov/sites/default/ files/unreported-opinions/0119s21.pdf [https://perma.cc/YGG3-Q6FD], cert. denied, 479 Md. 465 (2022).

[14] But see State v. Osborne, No. 37779-2-III, slip op. (Wash. Ct. App. Jan. 27, 2022) (unpublished) (declining to consider issue because not sufficiently briefed), https://www.courts.wa.gov/opinions/pdf/377792_unp.pdf; State v. Dean, No. 82366-3-I, slip op. at 3 n.2 (Wash. Ct. App. Aug. 8, 2022) (unpublished) ("Dean also stated he had difficulty hearing and strained to hear people talking through masks, and his attorney also was concerned about how wearing a mask prevented him from fully using his 'toolbox as it were.' Dean does not raise these issues on appeal."), https://www.courts.wa.gov/opinions/pdf/ 823663.pdf. See GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").

Second, these cases conclude that the parties' inability to see a juror's mouth and nose deprives them of access to only a small part of their demeanor. They focus on the observation that "[d]emeanor includes the language of the entire body," and that other aspects of voir dire, such as questionnaires and questioning, permit gathering "sufficient information to detect bias." United States v. Crittenden, No. 4:20-CR-7 (CDL), 2020 WL 4917733, at *7-8 (M.D. Ga. Aug. 21, 2020) (court order); see also United States v. Tagliaferro, 531 F. Supp. 3d 844, 851 (S.D.N.Y. 2021) (defendant is "still free to examine and assess juror credibility in all critical aspects besides the few concealed by the wearing of a mask"); United States v. Trimarco, No. 17-CR-583 (JMA), 2020 WL 5211051, at *5 (E.D.N.Y. Sept. 1, 2020) (court order) ("Being able to see jurors' noses and mouths 'is not essential' for assessing credibility."). At least one court has suggested that the potential difficulty caused by face masking has been partially mitigated over time because "people have become accustomed to conversing with masks during the past year and a half." United States v. Maynard, No. 2:21-CR-00065, 2021 WL 5139514, at *2 (S.D. W. Va. Nov. 3, 2021) (memorandum opinion and court order).

Finally, while acknowledging the necessity that the parties be able to ascertain bias, courts emphasize the countervailing need to provide for safety of all participants in the midst of a pandemic. United States v. Thompson, 543 F. Supp. 3d 1156, 1164 (D.N.M. 2021) (the defendant's "ability to ask questions during voir dire and to see the upper half of prospective jurors' faces is enough to satisfy his constitutional rights during jury selection, at least during an ongoing

No. 83387-1-I/13

global pandemic"); United States v. Robertson, No. 17-CR-02949-MV-1, 2020 WL 6701874, at *2 (D.N.M. Nov. 13, 2020) (memorandum opinion and court order) (seeing faces and asking questions enough, "at least in the middle of a global pandemic"); United States v. Smith, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021) (trial courts have "inherent authority" and " 'grave responsibility' " to ensure safety of trial participants (quoting Morgan v. Bunnell, 24 F.3d 49, 51 (9th Cir. 1994)).

    4.  Application to Bell's Jury Selection

Here, we conclude that the trial court did not abuse its discretion when it denied Bell's motion. It did not adopt procedures that no reasonable person could support.

The trial court was responsive to Bell's concerns throughout the selection process. Per the Snohomish County emergency order, Bell had the option to conduct voir dire online if he wished, which would have permitted access to the potential jurors' faces, albeit at the cost of some of their body language. He did not take advantage of this option, instead requesting that jurors wear face shields. The court denied his request, saying, "[T]his is a safety issue as far as I'm concerned." But it also, in response to this and other worries raised by Bell's attorney, indicated a willingness to offer more time for jury selection than would otherwise have been allotted.[15] The court, at the request of defense counsel, ultimately permitted 30 minutes of questioning for each, rather small, batch of 15

_____

[15] The trial court stated, "In my experience, if I give you more time, you can explore every issue that you need to explore adequately."

13

potential jurors, and again offered to extend that time if needed. But no extra time was necessary; instead, during discussion with one batch of potential jurors, defense counsel did not even use all of the time initially allotted.

Even under normal circumstances, without a global contagion and the face masking it requires, significant variations exist in trial court jury selection. Some courtrooms place counsel and parties farther away from juries or at an angle, less able to see the nuances of their expression or hear the subtleties of their inflection. Some jurors are more or less hidden within jury boxes. Time for questioning and availability of questionnaires differ courtroom to courtroom and case to case.

These circumstances, however, were not normal. The Washington State courts' responsibilities to jurors (and others)—who reasonably feared for their safety—were far graver than usual. And the trial court was acting under the umbrella of orders from the Washington State and county courts and the state executive that aimed not only to protect the rights and health of the individuals involved in particular proceedings but also to avoid any possible spread of the contagion beyond the participants. The trial court's decision could have resulted in adverse health outcomes both in and out of the courtroom. By eroding trust of both court employees and the greater public in the judiciary's safety protocols, this could have hampered the judiciary's ability to function at all during the pandemic.

Here, the trial court's decision to require potential jurors to wear face masks may have deprived Bell of some portion of his ability to assess their

14

demeanor. But jurors' discomfort at being forcibly unmasked in a crowded room around a group of strangers in the midst of a pandemic may have also affected their demeanor and impeded accurate determination of their mood and credibility.[16] And their tone of voice, body language, eyes, and other aspects of their demeanor remained as accessible as they normally would have been. Judging credibility in such situations is inherently multivariable; some variables in the jury selection process may inhibit counsel's ability to determine credibility, while others may improve it. It is for this reason that the trial courts' knowledge of their courtroom, parties, jurors, and situation generally provides them with the best opportunity to assess matters, and this is why they are given discretion in the manner of jury selection.

The trial court here, recognizing the departure from standard procedures face masking entailed, made sure to accommodate the parties' concerns. In particular, it allowed more time for questioning, counterbalancing concerns about inability to assess demeanor. We therefore hold that the trial court did not abuse its discretion when, during a pandemic, it required jurors to wear face masks during jury selection.

5. Application to Bell's Trial

Bell contends that his right to an impartial jury was violated not only by the trial court's requirement that jurors wear face masks during selection, but also

---

[16] It is not only jurors who are concerned for their own health, of course, or for others' health. Counsel often come to court masked out of a concern for their own and others' safety even at the appellate level, where there are typically far fewer people in a courtroom.

15

during trial.  But his motion before the trial court focused exclusively on jurors wearing face masks during jury selection.  Any argument about the constitutionality of jurors remaining masked at trial was therefore not properly preserved for appeal, which usually precludes our consideration.  See RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.").

RAP 2.5(a) does allow argument about unpreserved issues where the issues are "manifest error affecting a constitutional right."  But the appealing defendant has the initial burden of showing that the error was of a constitutional dimension.  State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011).

The right to an impartial jury, however, is not typically implicated unless a biased juror was actually seated.  United States v. Martinez-Salazar, 528 U.S. 304, 316, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000).  Bell does not even assert that one was.  He does not explicitly address the issue of preservation at any point, and does not cite to cases that establish a relevant constitutional right that would ensure him, or his counsel, a view of jurors' (as opposed to witnesses') noses and mouths at trial.  Instead, Bell contends that inability to fully access jurors' demeanor prohibits counsel from tailoring their arguments to jurors' "apparent perceptions of the evidence, of the State's closing argument, and his or her own closing argument."  And he refers to RCW 2.36.110, which requires removal of seated jurors who manifested unfitness to serve during trial.  But this is not enough to meet his initial burden under RAP 2.5(a), and as a result, we do not consider this issue.

No. 83387-1-I/17

Double Jeopardy

Bell next contends that his conviction for both assault in the first degree with a firearm enhancement and drive-by shooting is barred by his constitutional protections against double jeopardy. We disagree.

The Washington and federal constitutions both prohibit the entry of multiple convictions for the same offense. State v. Womac, 160 Wn.2d 643, 650, 160 P.3d 40 (2007); see also WASH. CONST. art. I, § 9;[17] U.S. CONST. amend. V.[18] To determine whether a defendant's double jeopardy protections have been violated, Washington applies the "same evidence" rule, asking if they are the same in fact and in law. Womac, 160 Wn.2d at 652. "[I]f each offense includes an element not included in the other and requires proof of a fact the other does not," double jeopardy is not offended. State v. Harris, 167 Wn. App. 340, 352, 272 P.3d 299 (2012). Because double jeopardy claims raise issues of law, they are reviewed de novo on appeal. Womac, 160 Wn.2d at 649.

The two crimes of which Bell was convicted contain distinct elements. RCW 9A.36.011(1)(a) creates the crime of assault in the first degree, which is committed when a person "with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon." RCW 9A.36.045(1) creates the crime of drive-by shooting, which is committed when a person "recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or

---

[17] "No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense."

[18] "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."

17

serious physical injury to another person and the discharge is . . . from a motor vehicle." Conviction of assault in the first degree requires intent to inflict great bodily harm. Conviction of drive-by shooting requires discharge of a firearm from a motor vehicle. Each of these elements is present in only one of Bell's charged crimes. As a result, the two offenses are not the same in law.

Nor are the offenses the same in fact, for much the same reasons. Proof that Bell committed drive-by shooting required proof that he discharged his firearm from within a car. This proof would not have been required to show assault in the first degree, which does not have such specific requirements for the manner of the attack. On the other hand, his conviction of assault in the first degree required proof that he intended to inflict great bodily harm on Brooks. Such proof would not have been required to show drive-by shooting, which requires only a reckless discharge.

We therefore conclude that double jeopardy does not bar Bell's conviction for both drive-by shooting and assault in the first degree.

<u>Same Criminal Conduct</u>

Bell makes a second argument that his actions cannot support his two convictions, this time under statute rather than the constitution. He asserts that his two crimes concerned the same criminal conduct, a term of art used in Washington's sentencing scheme, and that the trial court therefore lacked the statutory authority to convict him as it did. Relatedly, Bell asserts that his counsel was ineffective for failing to argue the same criminal conduct issue at the trial court. We conclude that Bell did not preserve this issue for our direct

18

consideration because he affirmatively agreed to his offender score. But we reach it nonetheless by way of his ineffective assistance of counsel claim. We conclude that the court did not err by implicitly concluding that his offenses were not the same criminal conduct. Because no objection would have been sustained, his counsel was effective.

Washington's sentencing act determines the range of possible sentences the trial court may impose by considering both the seriousness of the crime involved and the defendant's criminal history. RCW 9.94A.530. The defendant's criminal history is accounted for through the use of an "offender score" calculated by assigning numerical values to each prior crime and adding them together; more serious crimes carry higher values. RCW 9.94A.525. "[W]henever a person is to be sentenced for two or more current offenses, the sentence range for each current offense [is] determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score." RCW 9.94A.589(1)(a).

Crimes may not, however, be counted separately in the offender score calculation if they encompass the "same criminal conduct." RCW 9.94A.589(1)(a). Same criminal conduct is "two or more crimes that [(1)] require the same criminal intent, [(2)] are committed at the same time and place, and [(3)] involve the same victim." RCW 9.94A.589(1)(a). Unless all of these elements are present, the criminal offenses must be counted separately. State v. Chenoweth, 185 Wn.2d 218, 220, 370 P.3d 6 (2016).

Determinations by the trial court about whether two offenses are the same criminal conduct are reviewed for abuse of discretion. State v. Aldana Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013). Where the record supports only one conclusion, the sentencing court abuses its discretion by ruling otherwise. Graciano, 176 Wn.2d at 537-38. Where the trial court has made no specific finding as to same criminal conduct but has calculated the offenses separately as part of the offender score, as here, the appellate court treats this as an implicit determination that the defendant's offenses did not constitute the same criminal conduct. State v. Channon, 105 Wn. App. 869, 877, 20 P.3d 476 (2001).

1. Preservation of Error

As a threshold matter, the State contends that this argument has been waived because it was not raised at the trial court. We agree that Bell may not directly challenge the trial court's implicit determination that his offenses do not constitute the same criminal conduct.

Under most circumstances, issues not raised at the trial court have not been preserved for consideration on appeal. RAP 2.5(a).[19] However, "[i]n the context of sentencing . . . illegal or erroneous sentences may be challenged for the first time on appeal." State v. Ford, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). An exception exists to this exception: where the alleged error is factual and discretionary in nature, rather than of a purely legal dimension, defendants

---

[19] RAP 2.5(a) carves out exceptions to this principle when (1) the trial court lacked jurisdiction, (2) a party failed to establish facts upon which relief could be granted, or (3) a "manifest error affecting a constitutional right" occurred. Bell does not invoke these exceptions to argue that we should consider this issue.

may waive their ability to challenge the error later on by agreeing to underlying facts. In re Pers. Restraint of Goodwin, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002). A defendant waives "any challenge to a miscalculated offender score by agreeing to that score (or to the criminal history on which the score is based) in a plea agreement or by other stipulation." Goodwin, 146 Wn.2d at 873. The same criminal conduct analysis is partially factual in nature and is reviewed for an abuse of discretion. RCW 9.94A.589(1)(a); Graciano, 176 Wn.2d at 536. A defendant can therefore waive their ability to challenge a same criminal conduct calculation that impacted the offender score used at their sentencing.

Bell waived his ability to challenge his offender score on appeal. In his sentencing memorandum, he wrote:

> The controlling standard range in this matter is 111-147 months (Assault First Degree, Offender Score of 2 points due to the other current offense of Drive by Shooting) . . . plus a 60 month Firearm Enhancement (due to the special verdict of the jury).
>
> The total controlling range is therefore 171 months to 207 months.

Bell had no prior adult felony convictions to be included in his offender score. Therefore, only his conviction for drive-by shooting impacted the length of his conviction for assault. By affirmatively agreeing to a controlling offender score of two, Bell necessarily asserted that the court did not need to conduct a same criminal conduct analysis.

It follows that the State is correct when it asserts that Bell did not preserve this issue for our direct review. We still reach it, however, by way of Bell's

argument that his attorney's failure to raise the issue in the trial court constituted ineffective assistance of counsel.

### 2. Ineffective Assistance of Counsel

Defendants enjoy a constitutional right to effective representation by counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984); State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995). To demonstrate that this right was violated by their attorney's defective performance, an appellant must demonstrate that (1) defense counsel's representation fell below an objective standard of reasonableness, and (2) except for counsel's unreasonable representation, the result of the proceeding would have been different. McFarland, 127 Wn.2d at 334-35. Because of the test's second element, failure to object where that objection would not have been sustained is not ineffective assistance of counsel. State v. Johnston, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007).

To prevail in his ineffective assistance of counsel claim, Bell must demonstrate that had his attorney raised the same criminal conduct issue at the trial court, he would have likely prevailed. In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). This, though, is a burden he cannot meet because his two offenses do not encompass the same criminal conduct.

Bell's offenses do not encompass the same criminal conduct because they did not involve the same victim, a necessary part of the same criminal conduct test. RCW 9.94A.589(1)(a). Freddie Brooks was the victim of Bell's assault, as reflected in the court's instructions to the jury: "[t]o convict the

No. 83387-1-I/23

defendant of the crime of assault in the first degree, [the State must prove that] the defendant assaulted *Freddie Brooks*." (Emphasis added.) In contrast, the jury instructions for drive-by shooting were less direct, requiring only that Bell created "a substantial risk of death or serious physical injury to *another person*." (Emphasis added.)

The language in the jury instructions for drive-by shooting tracks case law interpreting the drive-by shooting statute, which portrays it as a crime that criminalizes conduct that puts at risk—victimizes—the general public. See In re Pers. Restraint of Bowman, 162 Wn.2d 325, 332, 172 P.3d 681 (2007) ("Although a drive-by shooting may cause fear of bodily injury, bodily injury, or even death, such a result is not required for conviction. Drive-by shooting does not require a victim; it requires only that reckless conduct creates a risk that a person might be injured."). That it does not require a specific victim places drive-by shooting in that category of offenses whose "victim" can be the general public. See State v. Haddock, 141 Wn.2d 103, 110-11, 3 P.3d 733 (2000) (holding unlawful possession of a firearm victimizes the general public); State v. Williams, 135 Wn.2d 365, 369, 957 P.2d 216 (1998) (holding victim of intent to sell drugs was general public).

This legal conclusion about the nature of the charge is reflected in the facts of the case, which also support a determination that Bell's two crimes impacted different victims. The general public was victimized because Bell indiscriminately fired a gun in a public place, from the midst of traffic, with a commercial building behind his intended target. Jenkins, Brooks's girlfriend, was

walking near him when the shots were fired, was forced to take cover, and was also victimized.

Because the victim of Bell's assault, Brooks, is different from the victim of his drive-by shooting, the general public and Jenkins in addition to Brooks, we conclude that the trial court did not err by implicitly determining that his two offenses do not encompass the same criminal conduct. As a result, because a motion by Bell's attorney that his convictions be considered the same criminal conduct would not have been sustained, his counsel was not ineffective.

Statement of Additional Grounds

In addition to his attorney's briefing on appeal, Bell submitted a statement of additional grounds. Statements of additional grounds are permitted by RAP 10.10. They serve to ensure that an appellant can raise issues in their criminal appeal that may have been overlooked by their attorney. Recognizing the practical limitations many incarcerated individuals face when preparing their own legal documents, RAP 10.10(c) does not require that the statement be supported by reference to the record or citation to authorities. It does require, however, that the appellant adequately "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). And it relieves the court of any independent obligation to search the record in support of the appellant's claims, making it prudent for the appellant to support their argument through reference to facts where possible. RAP 10.10(c). To enable that factual support, it provides the means for appellants to obtain copies of the record from counsel. RAP 10.10(e).

24

No. 83387-1-I/25

Here, Bell has submitted a succinct statement consisting of only five sentences:

> Inside the hearing the person didn't appear in court[,] made the decision to not come. Their [sic] was no testimony.
>
> In the video that was shown the person had a hood on not being noticeable.
>
> . . . .
>
> While in the court every witness had no clue who did the shooting. Nobody identified me as the shooter.

We interpret this as raising two issues: (1) a confrontation clause challenge concerning the lack of testimony from Bell's victim Brooks—the noteworthy witness absence of the trial, and (2) a general challenge to the sufficiency of the evidence by which he was convicted. Neither challenge is successful.

1. Confrontation Clause

The Washington and federal constitutions both protect a criminal defendant's right to confront the witnesses against them and the defendant's right to obtain witnesses in their own favor. WASH. CONST. art. I, § 22;[20] U.S. CONST. amend. VI.[21] These are complementary rights. Relying on them, our state Supreme Court has rejected claims that the State's failure to call certain witnesses violated a defendant's rights, writing, "The right to process to compel the attendance of witnesses must be asserted and maintained." State v. Summers, 60 Wn.2d 702, 706, 375 P.2d 143 (1962) (concluding defendant's

---

[20] "In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face [and] to have compulsory process to compel the attendance of witnesses in his own behalf."

[21] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor."

25

article I, section 22 rights were not violated when State chose not to bring testimony from potential witnesses).  The State has no obligation to make a defendant's case for them; a defendant has the tools needed to make their own case and ensure witnesses' presence.

Here the victim of Bell's crimes, Freddie Brooks, did not testify.  He was in prison at the time of Bell's trial and was "essentially unwilling . . . to be involved in that way" with the charges against Bell.  Because the absence of such a key witness was noteworthy, it was discussed throughout the proceedings at the trial court.  In particular, during jury selection, the State sought to make sure that no jurors would hold Brooks's absence against it, and his absence was directly addressed in trial.  Because it was a running theme of trial and because Brooks is arguably the most material witness in the crime against Bell, it is reasonable to construe Bell's statement that "the person didn't appear in court[,] made the decision not to come" refers to Brooks's choice not to testify.

As in Summers, the State not calling Brooks to testify does not violate Bell's article I, section 22 and Sixth Amendment rights.  If Bell wished for Brooks's testimony, he could have compelled it.  He did not.  We conclude that Bell's right to confront the witnesses against him was not affected by Brooks's absence.

2. Sufficiency of the Evidence

Finally, Bell challenges whether the evidence admitted at trial was sufficient to support his conviction.  We conclude that it was.

26

Evidence is sufficient if " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Because credibility determinations are for the trier of fact—in this case, the jury—appellate courts "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Here, the evidence was sufficient for the jury to convict. Bell had fought with Brooks earlier in the day. He owned a gun of the same caliber used in the shooting, a gun he later claimed he had lost. The witnesses' descriptions of the make, model, and license plate of the shooter's car very closely matched Bell's car. And eyewitness testimony of the shooter's appearance, though very vague, roughly described Bell. Bell's arguments amount to the assertion that his conviction requires particular forms of evidence—namely, testimony from his victim and witnesses testifying that they recognized him as the shooter—to stand. This is incorrect. We conclude that the evidence was sufficient.

We affirm.

_Smith, C.J._

WE CONCUR:

_Díaz, J._

_Coburn, J._

27