IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>  v.<br><br>KAITLYN ROSE JOHNSTON,<br><br>     Appellant. | No. 86377-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Kaitlyn Johnston appeals her conviction for vehicular homicide committed by driving with disregard for the safety of others. Johnston argues that the evidence was insufficient to establish that she drove with "disregard for the safety of others" and that the jury instruction defining that term violated her right to due process by permitting the jury to find her guilty without proof that she consciously disregarded danger to others. She also claims that the trial court improperly imposed several legal financial obligations (LFOs). We affirm Johnston's conviction, but remand to the trial court to strike the challenged LFOs from her judgment and sentence.

FACTS

The State charged Kaitlyn Johnston with vehicular homicide committed by driving with disregard for the safety of others for striking and killing 74-year-old Kathleen Lord as she walked with her dog in a crosswalk. At trial, witnesses testified to the following events.

At around 7 p.m. on January 29, 2017, Johnston and her two-year-old child were driving back to Kelso after spending the weekend celebrating her birthday in Bellingham. The road was dry and the weather was clear. After taking a wrong turn, Johnston used her phone's GPS navigation to reach Old Fairhaven Parkway, a two-lane road divided by a median with a speed limit of 35 miles per hour (m.p.h.). After turning eastbound onto Old Fairhaven Parkway, Johnston put the phone on her lap and drove towards I-5. The road in that area is straight with unimpeded visibility.

Johnston saw the freeway in the distance and was thinking about whether to stop for gas when she struck Lord. Lord later died from her injuries. It was dark at the time of the collision, but the area surrounding the crosswalk was well-lit and bright yellow pedestrian-activated lights were flashing to indicate the crosswalk was in use. Johnston testified that her "first memory" of the accident was that "[her] windshield shattered." She noticed the crosswalk lights flashing in her rear view mirror, then looked back and realized she had hit a person. She pulled over and called her daughter's father, then called 911 and stayed on the phone until police arrived. Bellingham Police Department Officer Zachary Serad, a trained drug recognition expert, determined that Johnston was not impaired by drugs or alcohol, and her phone had no evidence that she had been texting or calling anyone at the time of the collision.

Johnston testified that she was paying attention to the road but admitted that she did not notice the crosswalk or flashing lights that were directly in front of her and did not see Lord prior to the collision. She was unable to explain how this

2

could have happened. Johnston said her child was not distracting her and that she was not actively using navigation or adjusting the stereo. And the State's collision reconstruction analysts determined that Johnston was driving close to the posted speed limit.

Several eyewitnesses testified at trial, all of whom were drivers or passengers in cars going westbound on Old Fairhaven Parkway at the time of the collision. Katie and Kathleen Nestle were passengers in a car that passed through the crosswalk seconds before the collision. Both saw Lord and her dog approach the crosswalk, then Kathleen turned around, saw the lights flash "maybe once or twice," and witnessed the collision. Kathleen testified that Lord was "a few feet into the crosswalk" and walking at "a pretty normal speed" when she was struck.

Gillian Grambo, who was driving the next westbound car, stopped at the crosswalk when she saw the flashing lights. Grambo did not see the collision, but recalled hearing what she thought was a strike and seeing a small white dog crossing with no pedestrian. She was not sure how long it was between when she saw the flashing lights and when the impact occurred, but thought it was definitely less than ten seconds and possibly less than five.

The driver of the car behind Grambo, Valentina Apostol-Maughan, testified that she stopped because the car in front of her had stopped and because she saw the flashing lights. Apostol-Maughan saw the collision and thought the lights had flashed three times before it happened. Kennedy Erickson, a passenger in the same car, testified that she saw the lights begin to flash before Lord started

3

walking across the street at a "normal walking speed." Erickson saw Johnston's car coming and realized that it was not going to stop before it hit Lord.

Colt and Madison Spoltman were in the car behind Apostol-Maughan and Erickson. They saw the crosswalk lights come on and saw a white dog run across the intersection. They joked that it looked like the dog had pushed the crosswalk button, then realized that someone had been hit.

Bellingham Police Department collision investigators Lewis Leake and Bill Medlen testified at trial. After determining that Johnston's car was traveling between 30 and 35 m.p.h. before the collision, they applied an estimated walking speed based on Lord's age to calculate how long it would have taken Lord to reach the point of impact after activating the crosswalk lights depending on whether she walked via the curb cut or stepped directly in the street. Using these two walk time estimates, they calculated the time it would have taken Johnston to come to a stop at either 30 or 35 m.p.h. from the point at which an attentive driver could have seen and reacted to the danger ahead. They concluded that under any scenario, Johnston would have had enough time and space to avoid the collision if she had noticed and reacted to the crosswalk and flashing lights. Given the absence of evidence accounting for Johnston's failure to observe what was plainly visible or to attempt to stop when other drivers managed to do so, the investigators were compelled to infer that Johnston's "eyes were not on the road."

Johnston asked the court to modify the pattern jury instruction defining "disregard for the safety of others" by adding a sentence clarifying that

"[e]vidence of some conscious disregard of the danger of others is necessary for someone to act with disregard for the safety of others."[1] See 11A Washington Practice: Washington Pattern Jury Instructions: Criminal 90.05, at 317 (5th ed. 2021) (WPIC). Over Johnston's objection, the trial court used the pattern instruction to define "disregard for safety of others":

> Disregard for the safety of others means an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than ordinary negligence. Ordinary negligence is the failure to exercise ordinary care. Ordinary negligence is the doing of some act which a reasonably careful person would not do under the same or similar circumstances. . . .  Ordinary negligence in operating a motor vehicle does not render a person guilty of vehicular homicide.

WPIC 90.05.

After deliberations began, the jury asked the court to provide "the legal meaning of agrivated [sic] kind of negligence or carelessness." The court responded that "the instructions you are provided are complete and no further meanings, definitions or instructions will be given."

The jury convicted Johnston as charged. The court sentenced Johnston to 18 months of total confinement and 18 months of community custody. The court also imposed Department of Corrections (DOC) supervision fees, a $500 victim penalty assessment (VPA), a $200 criminal filing fee, a $250 jury demand fee, a $100 DNA collection fee, and a $100 crime laboratory analysis fee.

Johnston appeals.

---

[1] Johnston alternatively proposed several similar formulations of this language, including (1) "Conscious disregard for the safety of others is necessary for someone to act with disregard for the safety of others"; (2) "Disregard for the safety of others means that one acts with a conscious disregard of danger to others"; and (3) "Disregard for the safety of others means that one acts with a conscious disregard for the safety of others."

DISCUSSION

Johnston claims the evidence was insufficient to prove vehicular homicide and that the jury instruction defining "disregard for the safety of others" violated due process by permitting the jury to find her guilty without finding that she consciously disregarded danger to others. She also seeks remand for the court to strike the challenged LFOs from her judgment and sentence.

I.  Sufficiency of the Evidence

Johnston argues that reversal and dismissal with prejudice is required because the record lacks evidence that she acted with "disregard for the safety of others" when she struck and killed Lord. We disagree.

"To determine if sufficient evidence supports a conviction, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Zghair, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). A claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. In determining sufficiency of the evidence, "circumstantial evidence is not to be considered any less reliable than direct evidence." State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury's credibility determinations

and its decisions regarding the persuasiveness of the evidence. State v. Bell, 26 Wn. App. 2d 821, 847, 529 P.3d 448 (2023).

Under RCW 46.61.520(1), a driver commits vehicular homicide if a person dies "within three years as a proximate result of an injury proximately caused by" a driver who operated a motor vehicle: (a) while under the influence of intoxicating liquor or any drug as defined in RCW 46.61; or (b) in a reckless manner; or (c) with disregard for the safety of others. Johnston was charged under RCW 46.61.520(1)(c), and the only contested issue was whether she was driving with disregard for the safety of others.

More than ordinary negligence is required to sustain a conviction for vehicular homicide by disregard for the safety of others. State v. Eike, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). In Eike, our Supreme Court upheld Eike's conviction for negligent homicide by disregard for the safety of others after he drove at 45 to 50 m.p.h. on a dark, wet, but well-marked highway, rounded a sweeping curve on the wrong side of the road at night, and collided with an oncoming car.[2] Id. at 766. The court defined "disregard for the safety of others" as "an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term 'negligence.'" Id. at 765-66. The court further described the distinction as follows:

> Every violation of a positive statute, from a defective taillight to an inaudible horn may constitute negligence under the motor vehicle statutes, yet be unintentional, committed without knowledge, and amount to no more than oversight or inadvertence but would

---

[2] "Negligent homicide" was renamed "vehicular homicide" when the statute was recodified in 1983. LAWS OF 1983, ch. 164.

probably not sustain a conviction of negligent homicide. To drive
with disregard for the safety of others, consequently, is a greater
and more marked dereliction than ordinary negligence.

Id. at 766.

In State v. Lopez, 93 Wn. App. 619, 970 P.2d 765 (1999), Division Three added an interpretive gloss to Eike's definition of "disregard for the safety of others." There, the trial court dismissed vehicular homicide charges against an unlicensed 14-year-old driver where the only evidence that she drove with disregard for the safety of others was the fact that she did not have a driver's license. Id. at 621. There was no evidence that Lopez was an inexperienced driver or that she was speeding, participating in horseplay, or under the influence of drugs or alcohol. Id. at 623. The State argued that the mere fact that Lopez violated the licensing statutes constituted negligence per se and established a prima facie case of disregard for the safety of others. Id. at 622. On appeal, Division Three held that the statutory violation was insufficient to establish that she acted with disregard for the safety of others and that "[s]ome evidence of the defendant's *conscious disregard* of that danger is necessary to support vehicular homicide." Id. at 623 (emphasis added).

Division Three followed Lopez in State v. Vreen, 99 Wn. App. 662, 672, 994 P.2d 905 (2000), aff'd,143 Wn.2d 923, 26 P.3d 236 (2001), abrogated on other grounds by Rivera v. Illinois, 556 U.S. 148 (2000). In Vreen, the State charged the driver with vehicular homicide and vehicular assault of his passengers. 99 Wn. App. at 663-64. In rejecting the State's claim that evidence of the driver's close relationship with his passengers was irrelevant to a

8

determination that he acted with disregard for the safety of others, the court relied on Lopez's definition of conscious disregard and reasoned, "[t]here is a mental element to 'carelessness' or 'conscious disregard.' . . . A person can choose to be careless." Id. at 672.

Relying on Lopez and Vreen, Johnston argues that reversal is required because there is no evidence of any conscious choice she made that would explain why she did not see the crosswalk, the lights, or Lord. She contends that a person cannot "consciously disregard" a danger of which they are not aware and points out that she cannot explain why the accident happened, unlike cases where there was evidence that the defendant ignored a known danger. See, e.g., State v. Knowles, 46 Wn. App. 426, 430, 730 P.2d 738 (1986) (intoxicated defendant ignored passengers' pleas to stop speeding); State v. Brewer, No. 79442-6-I, slip. op. at 20 (Wash. Ct. App. March 8, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/794426.pdf (driving without prescription glasses after staying out all night); State v. Visoso, No. 37413-1-III, slip op. at 12 (Wash. Ct. App. Sept. 28, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/374131_unp.pdf (intoxicated defendant reaching for cell phone).[3]

We decline Johnson's invitation to read Lopez expansively to require the State to prove a specific reason why she stopped paying attention to the road. The Lopez court distinguished the term "conscious disregard" from negligence

---

[3] We generally do not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in our decisions. GR 14.1(c). But we may cite unpublished opinions of this court filed on or after March 1, 2013 as nonbinding authorities and accord such persuasive value as we deem appropriate. GR 14.1(a).

9

per se, noting that "Washington has abolished the doctrine of negligence per se except in certain statutorily defined circumstances not relevant here." 93 Wn. App. at 622, n.1 (citing RCW 5.40.050). Unlike negligence per se, conscious disregard requires some proof of affirmative action or conduct. Id. at 623. In the absence of this evidence, the Lopez court refused to impose criminal liability for vehicular homicide based solely on a statutory violation. Id.

Unlike in Lopez, here, the State did not allege that Johnston's disregard for the safety of others arose from a statutory violation. Instead, the State argued that uncontroverted evidence established Johnston was completely unaware of the well-lit crosswalk in which she fatally struck Lord after failing to brake, despite flashing yellow lights that alerted several other motorists to stop. Indeed, Johnston acknowledges the State presented evidence from which a rational jury could infer from the circumstances that she stopped paying attention to the road. A reasonable jury could conclude that Johnson's prolonged failure to pay attention to the road—despite bright flashing lights designed to alert drivers to the presence of a pedestrian in the crosswalk and oncoming traffic coming to a stop in response—constituted disregard for the safety of others. See Vreen, 99 Wn. App. at 672 (noting that "a person can choose to be careless"); cf. Matter of Detention of D.H., 1 Wn.3d 764, 777, 533 P.3d 97 (2023) ("[d]isregard" means "to treat without fitting respect or attention," "to treat as unworthy of regard or notice," and "to give no thought to : pay no attention") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 655 (2002)).

We also agree with the State that "conscious disregard" is not equivalent to a deliberate choice to ignore a known danger. Recklessness, which the Eike court explained is more serious than disregard for the safety of others, occurs when a person "knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(c); State v. Roggenkamp, 153 Wn.2d 614, 622, 106 P.3d 196 (2005) (quoting State v. Thompson, 90 Wn. App 41, 48, 950 P.2d 977 (1998)) (" 'reckless' under the vehicular assault and vehicular homicide statutes means driving in a rash or heedless manner, indifferent to the consequences."). A knowing choice to speed through a well-lit crosswalk with flashing pedestrian lights would go beyond disregard for the safety of others and establish the more culpable state of recklessness. Notably, at least one commentator has observed that the "conscious disregard" requirement makes it "hard to see what difference there is between 'disregard' and 'recklessness.'" See Seth A. Fine, 13B Washington Practice: Criminal Law and Sentencing § 33:4, at 296 (3d ed. 2019). There was sufficient evidence from which a reasonable jury could conclude that Johnston drove with disregard for the safety of others.

II.  Jury Instruction

Johnston argues that the trial court erred by refusing to add language to the pattern jury instruction, WPIC 90.05, to specify that disregard for the safety of others "requires proof that the accused was conscious of danger to others and chose to ignore it." We disagree.

"Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). The relevant legal standard must be "manifestly apparent to the average juror." State v. Weaver, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021). We review alleged errors of law in jury instructions de novo. State v. Bland, 128 Wn. App. 511, 514, 116 P.3d 428 (2005).

Johnston argues that the pattern jury instruction violated due process because it allowed the jury to convict her of vehicular homicide if it determined that her conduct was more than "ordinary negligence," regardless of whether she was aware of any danger to others. Her argument is based on an assertion that vehicular homicide by disregard for the safety of others requires a higher culpable mental state than criminal negligence because it requires proof that a person was aware of danger and ignored it.[4] As discussed above, Johnston overextends Lopez's holding.

The pattern instruction defining "disregard for the safety of others," used by the court in this case, is adapted from the one used in Eike. See Eike, 72 Wn.2d at 766 (approving a jury instruction that stated "to operate a motor vehicle with disregard for the safety of others, means just what the words imply"); WPIC 90.05 cmt. at 318. Our Supreme Court has upheld the language of this pattern jury instruction as constitutionally valid, and Johnston identifies no legal authority

---

[4] "Criminal negligence" is the "failure to be aware of a substantial risk that a wrongful act may occur and [the] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

stating that it is not a correct statement of Washington law. Significantly, the WPIC committee has not revised the instruction to incorporate the "conscious disregard" language since Lopez and Vreen were decided more than two decades ago.

Johnston also asserts that the jury must have been confused about the definition of "disregard for the safety of others" because it asked the court, "What is the legal meaning of aggravated kind of negligence or carelessness?" However, "[a] single jury question 'does not create an inference that the entire jury was confused, or that any confusion was not clarified before a final verdict was reached.' " State v. Rivers, 1 Wn.3d 834, 870, 533 P.3d 410 (2023) (quoting State v. Ng, 110 Wn.2d 32, 43, 750 P.2d 632 (1988)). The trial court responded that the instructions were complete and the jury did not ask any further questions. We decline to infer that the jury was unable to apply the standard.

III.  LFOs

Johnston argues, and the State concedes, that we should remand for the trial court to strike the DOC supervision fees, VPA, criminal filing fee, jury demand fee, DNA collection fee, and crime laboratory analysis fee. We accept the State's concession.

By the time Johnston was sentenced in February 2024, the legislature had eliminated DOC supervision fees and the DNA collection fee. LAWS of 2022, ch. 29, § 8; RCW 9.94A.703(2); RCW 43.43.7541; see State v. Ellis, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023), review granted, 4 Wn.3d 1009, 564 P.3d 547 (2025). Additionally, courts lack authority to impose the VPA, criminal filing fee,

or jury demand fee on defendants found indigent at the time of sentencing, as defined in RCW 10.01.160(3). See also RCW 7.68.035(4); RCW 36.18.020(2)(h); RCW 10.46.190. Although the court did not rule on Johnston's indigency at sentencing, the State concedes that the court's subsequent order authorizing review at public expense based upon her attorney's declaration is an implicit finding of indigency. Accordingly, we remand for the trial court to strike these fees.

RCW 43.43.690(1) mandates a $100 crime laboratory analysis fee "[w]hen an adult offender has been adjudged guilty of violating any criminal statute of this state and a crime laboratory analysis was performed by a state crime laboratory." The State agrees that no such analysis was performed, so the trial court should also strike this fee.

CONCLUSION

We remand for the limited purpose of striking the challenged LFOs from Johnston's judgment and sentence. We otherwise affirm.

_Chung, J._

WE CONCUR:

_Díaz, J._          _Smith, J._