IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of the Dependency of ) | |
| ) | No.  40721-7-III |
| ) | (consol. with 40755-1-III, |
| L.X.S. † ) | 40756-0-III) |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | UNPUBLISHED OPINION |
| ) | |

COONEY, J. — J.-M.R.D. (Father) is the father of L.X.S, A.L.S., and R.S.  After

numerous reports to Child Protective Services (CPS) regarding suspected abuse of the

children, the Department of Children, Youth, and Families (Department) filed

dependency petitions as to all three children, and they were each placed in foster care.  A

fact-finding hearing was later held at which the Father appeared pro se.  Following the

fact-finding hearing, the court entered its "Order on Dependency" and "Order of

---

† To protect the privacy interests of L.X.S. and their minor siblings, we use their
initials throughout this opinion.  Gen. Order for Court of Appeals, *In re Changes to Case
Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

Disposition" finding the children dependent and placing them in licensed care. Clerk's Papers (CP) at 69-89.

The Father appeals arguing: (1) the trial court erroneously admitted a hearsay laden "Unusual Incident Report" from a supervised visit; (2) the trial court wrongly excluded some of the Father's impeachment materials; (3) the court was biased against him; and (4) his right to confront adverse witnesses was violated. The Father raises various constitutional claims related to each issue. Finding no error, we affirm.

## BACKGROUND

The Father has three children in common with J.S.: nine-year-old L.X.S., eight-year-old A.L.S., and five-year-old R.S. L.X.S. has special needs, including autism spectrum disorder, attention deficit hyperactivity disorder (ADHD), hearing loss, a developmental delay, and a congenital malformation of his kidney. A.L.S. also has special needs, including speech delays, hearing loss, a cognitive delay, ADHD, and oppositional defiant disorder.

The family has had extensive involvement with child welfare agencies in Alaska, Washington, and Idaho. Prior to the present dependency, A.L.S. and X.L.S. had "previously been dependent in the State of Washington" and been placed into shelter care before being returned home. CP at 4. A.L.S. and R.S. were also involved in dependency proceedings in Idaho from 2022 to 2023 but were ultimately placed with the Father. The Father had his parental rights to his other children terminated in the state of Alaska and

2

has "six (6) substantiated findings of sexual abuse, physical abuse, and mental injury regarding his own biological children and other children in his care." CP at 4.

In 2023, a daycare provider asked R.S. about bruising on his back, side, and face. R.S. responded that the Father "hurts" him. Rep. of Proc. (RP) (July 29, 2024) at 669. In the following weeks, Department social worker Jason Haines met with the children on multiple occasions and noted bruising on A.L.S.'s knee, forearm, and eye. The children provided inconsistent stories for how the bruising on R.S. and A.L.S. occurred. The Father blamed L.X.S. for the other boys' injuries.

Mr. Haines later received an intake regarding a surveillance video taken at the family's transitional housing. The video showed R.S. playing in a stairwell and walking up and down the stairs. The Father is then seen entering the top of the stairwell, and R.S. appears to duck down and cover his head on seeing the Father. The Father first grabbed R.S. by his arm followed by the hood of his jacket and then pulled R.S. down the stairs. As the Father pulled R.S. down the stairs, R.S.'s head is seen hitting the metal railing of the stairwell or the wall. The Father then carried R.S. back up the stairs and appeared to punch R.S. in the head.

The Department filed dependency petitions as to all three children and obtained court orders to take the children into temporary emergency custody shortly after it received the intake about the video. All three children were ultimately placed in foster care during the pendency of the dependency proceedings. The court held a four-day fact

3

finding and disposition hearing in July 2024. The Father represented himself at the hearing.

Multiple witnesses testified for the Department. Kathy Ormsby, a nurse practitioner employed by Partners with Families and Children (Partners), testified she performs medical consults as part of a child abuse treatment team at Seattle Children's Hospital. At Partners, Ms. Ormsby sees "children whenever there's a concern for child maltreatment, child abuse." RP (July 25, 2024) at 230. She testified she has "multiple, multiple hours of advanced training, [and] over 400 hours of clinical education specific to child maltreatment." RP (July 25, 2024) at 231. Based on her training and experience, she was qualified as an "expert nurse practitioner specializing in child abuse and neglect." RP (July 25, 2024) at 234.

Ms. Ormsby conducted child abuse assessments of R.S., L.X.S, and A.L.S. In conducting R.S.'s assessment, she reviewed his medical history, watched the surveillance video, and spoke with both R.S. and his grandmother, P.S. R.S. reported "having been hit in the head by his father" and "having a significant headache." RP (July 25, 2024) at 246-47. Ms. Ormsby also observed a "kind of rug burn type of injury" to R.S.'s flank that R.S. stated had been caused by the Father. RP (July 25, 2024) at 252.

The surveillance video was played during Ms. Ormsby's testimony. When testifying about the surveillance video, Ms. Ormsby noted that R.S. immediately sat down and covered his head when he saw the Father enter the stairwell that indicated to

her a "very significant fear response and defensive pose." RP (July 25, 2024) at 259.

She stated this behavior is typical of children who have experience with "forcible hitting

or grabbing." RP (July 25, 2024) at 259. Ms. Ormsby opined that the rug burn type

injury could have been caused by the Father pulling R.S.'s clothing as seen in the

surveillance video. She also concluded she was "quite certain" R.S. had sustained a

concussion during the incident seen in the surveillance video. RP (July 25, 2024) at 269.

Lauri Moon, a nurse practitioner at CHAS Health, also testified at the fact-finding

hearing. She testified that she provided medical care to L.X.S. and A.L.S. for nearly a

year. She testified the Father parented the children "very well," and they never showed

signs of "being abused." RP (July 25, 2024) at 331. Ms. Moon stated she "didn't see any

abuse" after the surveillance video was played for her. RP (July 25, 2024) at 361.

Geralynn Gaddy, a special education teacher at Holmes Elementary, testified

about working with L.X.S. when he was in first and second grade. Ms. Gaddy testified

she made two reports to CPS due to "concerns for [L.X.S.'s] safety at home." RP

(July 25, 2024) at 374. She reported on one occasion he came to school with a "black

eye" and on another occasion she noticed "bruises on his arms." RP (July 25, 2024) at

374. After L.X.S. was placed in foster care, Ms. Gaddy testified, "[H]is attendance was

more consistent, and he just didn't have, like, as many high days and low days. Like, it

was more even-keeled, mostly." RP (July 25, 2024) at 375. Jenn Thomas, another

teacher who worked with both A.L.S. and X.L.S., also testified. Ms. Thomas testified

5

once A.L.S. was moved into foster care, "his behaviors were, like, very minimal," and someone "would never guess that he had a behavior [individualized education program]." RP (July 26, 2024) at 413. She also stated the Father would send her "odd emails that weren't making sense," and "the emails were so erratic that my principal suggested not responding." RP (July 26, 2024) at 417.

Department social worker Caitlyn Kwamina testified as an expert in "child welfare, development, [and] safety." RP (July 29, 2024) at 838. Ms. Kwamina testified her concerns about the Father "have not been rectified and have only . . . gotten worse" since the dependency began. RP (July 29, 2024) at 847. Ms. Kwamina did "not believe the children would be physically safe with [the Father] at this time." RP (July 29, 2024) at 847. She identified the Father's parental deficiencies as "a lack of appropriate parenting skills," "anger management," "mental health," and "inappropriate physical discipline." RP (July 29, 2024) at 847. Ms. Kwamina testified the Department offered to provide the Father with a "mental health evaluation and engagement," urinalysis testing, an anger management assessment, a domestic violence assessment, a psychological evaluation, and evidence-based parenting programs. RP (July 29, 2024) at 856. The Father declined these services. Ms. Kwamina noted that the Father had "demonstrated that he definitely can be an advocate for their special needs, access to services, [and] access to medical care," but "his day-to-day ability to manage the emotional, physical, psychological, [and] safety needs of these children has been inconsistent." RP (July 29,

2024) at 846. She opined the children are "physically unsafe when [the Father] is angry" or "upset with them." RP (July 29, 2024) at 846.

Leann Kaufman, the owner and director of Encompass Family Services (Encompass), also testified. Encompass is an agency that provided supervised visitation between the Father and the children. She testified the "visits were difficult to manage" and required "two supervisors." RP (July 26, 2024) at 493. She noted the Father "always voiced that he was [the children's] attorney and they couldn't talk to us or CPS." RP (July 26, 2024) at 493.

During Ms. Kaufman's testimony, the Father made numerous, nonevidentiary based objections. After the Father objected to Ms. Kaufman's testimony based on "[s]peculation and defamation," the court cautioned, "If you continue to interrupt with objections that are not founded, at some point, the Court is going to have to consider how to limit that." RP (July 26, 2024) at 493-94. During direct examination, counsel for the Department questioned Ms. Kaufman about what an "Unusual Incident Report" (UIR) was. Ms. Kaufman explained:

> A UIR is an unusual incident report, and one of those is written any time a child's safety is impacted or there's something that kind of raises the bar to, hmm, that was concerning, and we need to let the social worker know. It could be that one of the kids fell and hurt themselves, and we document that. It could be that the parent was yelling, cursing because they didn't like what the staff said, and we would also document that because it happened in front of the kids.

7

RP (July 26, 2024) at 496-97.  Ms. Kaufman testified she writes UIRs on occasion and sends them to the "social worker" when she does.  RP (July 26, 2024) at 497.  She stated she had written "several" UIRs related to visitations between the Father and L.X.S., A.L.S., and R.S.  RP (July 26, 2024) at 498.  In particular, Ms. Kaufman testified about a UIR stemming from a visit between the Father and his children in March 2024.  The Department sought to admit the UIR as exhibit P-5.  The Father objected to exhibit P-5's admission:

> THE COURT: [Father], any objection?
>
> [THE FATHER:] Yes, Your Honor. There is a counter evidence that's already been retained to the case summary index disputing and counterclaims to this incident report. And within that, there's a copy of this original report, and it does not coincide with this, as it's been reported previously to the Court.
>
> THE COURT: You may cross-examine to that issue of inconsistencies. The witness testified they have reviewed this. It is an accurate copy of their report. At this time, [counsel for the Department], what would be an exception to hearsay? This is still an out-of-court statement.

RP (July 26, 2024) at 505.  Counsel for the Department responded that the UIR fell into the business records exception to hearsay, and the court agreed.

Ms. Kaufman testified about the events that gave rise to the UIR.  She explained that the Father "appeared upset" at the visit and was "loud" and "abrasive."  RP (July 26, 2024) at 507.  One of the children was cleaning out their backpack and the Father asked where "the bad [behavior slips]" were.  RP (July 26, 2024) at 507.  The child responded

8

that "the caregiver" took them out to which the Father replied, "'Those are for me,' and they can't take those out, and 'Those belong to me,' and that he was going to sue and that he is their legal representative, and he kind of went down this rabbit hole of CPS and social workers." RP (July 26, 2024) at 507. The Father lodged objections to this testimony:

> [THE FATHER:] Defamation of character.
>
> THE COURT: . . . defamation is not an objection. Would you point to what form that objection would take that the Court would consider defamation as an evidence objection?
>
> [THE FATHER:] Misstating or quoting an individual that is present and currently able to dispute and to challenge to credibility of the claim.
>
> THE COURT: Because you can dispute, both through cross-examination and through your own testimony of the statement, the witness is free to testify as they—memory serves them, and as such, it is not defamation, nor is it—
>
> [THE FATHER:] CR 60(b) subpart—or 2 subpart (b), CR 60. Maliciously retained to the record.
>
> THE COURT: All right . . . CR 60 is relief from judgment or order. If you continue to miscite to the laws for the purposes of making nonevidentiary objections, the Court will have to consider whether any form of CR 11 or other sanctions are applicable, potentially. So I will just advise, please be sure that your objections are related to appropriate objections.
>
> So as such, I understand that there are barriers and that it is difficult when you are unrepresented, which is why the Court had previously gone through extensive colloquy about the waiver of counsel. But you are held to the same standard as a lawyer through the participation, even though the Court would also recognize the inequities and try and adapt to those to facilitate the interest of the hearing. So—

No. 40721-7-III (consol. with 40755-1-III, 40756-0-III)
*In re Dependency of L.X.S.*

> [THE FATHER:] You just stated that, and yet the witness is
> claiming that the individual is claiming to be an attorney in these matters,
> and yet you yourself just claimed that I am seen as a pro se litigant and held
> as an attorney, and yet the claim is being made.
>
> THE COURT: . . . you are held to the same standards. You are not
> —when you are representing yourself as an attorney, that does not mean
> you are an attorney, nor are you—can hold yourself out as an attorney. You
> can act as your own representative. You are not an attorney, but you are
> held to those same standards. It is a difficulty that the Court recognizes
> when an individual is unrepresented, as I've recognized here.
>
> So for the clarity, you are not held as an attorney, but you are held to
> the same practice standards as an attorney when you are representing
> yourself, which was part of the colloquy we've gone over and
> Commissioner Stewart, I believe, went over to make you understand the
> pitfalls and barriers to representing yourself as you have chosen to do.

RP (July 26, 2024) at 507-10. Ms. Kaufman continued testifying about the UIR and explained the Father's behavior continued to escalate during the visit despite attempts to redirect his behavior. She stated at one point, one of the children was on Facebook on his phone and was reminded that "we can't be on social media during visits." RP (July 26, 2024) at 511. The Father again objected:

> [THE FATHER:] Vague.
>
> THE COURT: . . . your objection.
>
> . . . .
>
> [THE FATHER:] Vague and nondetailed. She's not describing
> names or individuals.
>
> THE COURT: It's not vague. She indicated instead of visiting with
> your kids, you decided to play on Facebook.

[THE FATHER:] Excuse you, sir. That is not what was being said. You may want to read—that is not what she said, sir. She said the child was playing on the phone and said he was on Facebook, sir. Judicial bias, [Commission on Judicial Conduct (CJC)]. CJC 1.2 and 1.3, sir. We will not be—we will not be coy in these matters. We will acknowledge that these proprieties have been duly noted and sought, and as it is, as a pro se litigant, it is up to me to recognize whether or not to the individuals that CJCs have been reported. [Washington State Bar's] complaints have been issued, and they will be followed up with diligently.

THE COURT: Thank you . . . for pointing out the testimony that was given indicates that he was—they were watching—one of the boys said that he was playing a game. Because the "he" wasn't identified, I had thought that referred to the father, and that was a good clarification point. Perhaps, [counsel for the Department], you can indicate who the "he" is referred to.

[THE FATHER:] Excuse you. I think that deserves an apology, sir. I think I corrected accordingly to the courts and interjected appropriately, sir.

THE COURT: . . . the Court has no issue with you objecting, which is why we're hearing those. When you said "vague," the Court thought you meant as to the not identifying the specific boy involved with that. If the Court—so the testimony itself was not vague, but the use of the pronoun was. And so the Court is asking [counsel for the Department] to establish some clarification.

RP (July 26, 2024) at 511-12.  Ms. Kaufman clarified, "The boys were playing on the phones" not the Father.  RP (July 26, 2024) at 513.

On cross-examination, the Father attempted to impeach Ms. Kaufman's testimony about the UIR with prior positive visit reports.  The Department objected to admitting the reports through Ms. Kaufman because "[s]he has no personal knowledge of this visitation."  RP (July 26, 2024) at 524.  The court confirmed with the Father that the reports he sought to admit were not created by Ms. Kaufman's agency nor were they

11

drafted by her. The court advised the Father that his proffered exhibits could not be admitted through Ms. Kaufman but that he could ask her questions regarding whether it would "surprise" her if the there were other, positive reports. RP (July 26, 2024) at 526. On cross-examination, Ms. Kaufman confirmed the Father had "positive referrals" and that it would not surprise her if the Father had "positive reports" at "other agencies." RP (July 26, 2024) at 527, 529.

The Father testified that he does not "use physical discipline with the children" and that he does not "particularly" struggle with his mental health. RP (July 29, 2024) at 789, 796. He recited each of the children's personalities and special needs in detail. He also testified about the surveillance video and stated he was in "panic mode" when he saw R.S. and another individual in the stairwell. RP (July 29, 2024) at 785. He admitted to grabbing R.S. and stated, "[T]he video will express itself." RP (July 29, 2024) at 785.

Finally, the Department's pretrial proposed witness list included Detective Tiffany Austin. At trial, the Department declined to call Detective Austin as a witness and the Father objected. The court advised the Father that he could call Detective Austin as a witness, but the Father later indicated he was unsuccessful in procuring her to testify.

Following the fact-finding hearing, the court entered its "Order on Dependency and Order of Disposition." CP at 69-89. The court found the children were dependent under RCW 13.34.030(6) because there was "no parent, guardian or custodian capable of adequately caring for the [children] such that the [children are] in circumstances which

constitute danger of substantial damage to the child's psychological or physical development." CP at 79. The court found the surveillance video "compelling" and found "it showed a clear act of violent abuse." CP at 72. It also found Ms. Moon "lacked credibility" and went "to great lengths to minimize the assaultive behavior displayed in the stairwell video." CP at 75. The children were put in the "custody, control, and care" of the Department and were placed in "[l]icensed care." CP at 80. The court also found the Department made reasonable efforts to prevent or eliminate the need for removal of the children.

The Father appeals.

## ANALYSIS

### WHETHER THE COURT IMPROPERLY ADMITTED INADMISSIBLE EVIDENCE

The Father argues on appeal that the court erroneously admitted the UIR because it contained hearsay. He argues this error warrants reversal. Because the Father failed to preserve this evidentiary objection below, we decline to review it on appeal.[1]

---

[1] The Father argues, throughout his appeal, that his constitutional rights were violated due to his alleged errors. However, he does not explain how the court's alleged evidentiary errors violated his constitutional rights. "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 14, 721 P.2d 1 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970)). Thus, the Father's constitutional claims related to the evidentiary issues he raises are not addressed.

To preserve an evidentiary objection for appeal, the appellant must make a specific objection before the trial court. ER 103(a)(1); *State v. Harris*, 154 Wn. App. 87, 94, 224 P.3d 830 (2010). If the appellant objected to the admission of evidence on one ground before the trial court, he may not assert a different ground for excluding the evidence on appeal. *State v. Price*, 126 Wn. App. 617, 637, 109 P.3d 27 (2005), *abrogated by State v. Hampton*, 184 Wn.2d 656, 361 P.3d 734 (2015). An objection that does not specify the ground on which it is based is insufficient to preserve the issue for review. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

The Father objected when the Department moved to admit the UIR:

> [THE FATHER]: Yes, Your Honor. There is a counter evidence that's already been retained to the case summary index disputing and counterclaims to this incident report. And within that, there's a copy of this original report, and it does not coincide with this, as it's been reported previously to the Court.

RP (July 26, 2024) at 505. Because the Father did not object to admission of the UIR on hearsay grounds, he is precluded from asserting a different basis for exclusion of the evidence on appeal. Thus, we decline review of this alleged error.

WHETHER THE COURT IMPROPERLY EXCLUDED IMPEACHMENT EVIDENCE

The Father argues the court erred by improperly excluding some of his evidence. He argues this error violated his constitutional rights. We disagree that the court erred

14

and decline to address his constitutional claim because he does not explain how his rights were violated by any alleged evidentiary error.

At trial, the Father sought to use recent, positive, supervised visit reports to impeach Ms. Kaufman's testimony about negative supervised visits.[2] The court questioned the Father about his proffered evidence, and he admitted the report or reports he sought to impeach Ms. Kaufman with were not from "the date that she's talked about" and were not created by her agency. RP (July 26, 2024) at 525. Moreover, the Father did not demonstrate Ms. Kaufman was involved in drafting the report "in any manner." RP (July 26, 2024) at 525. The court did not admit the Father's proffered exhibit but instead advised him he could "ask your questions of the witness, and if they are contrary to information that you would like for them to consider, you can ask them to consider the fact there are positive incident reports." RP (July 26, 2024) at 526. The Father, and the court, then asked Ms. Kaufman:

> [THE FATHER:] Would it be—within your agency, has there been positive reports to your knowledge, Ms. Kaufman?
>
> . . . .
>
> [THE FATHER:] Correct. Has there been positive visitation or family time reports for [the Father] and his family through your agency?
>
> [MS. KAUFMAN:] Yes. You have had positive referrals.

---

[2] The exhibit at issue, R-122 or DCLR-120, is not a part of the record on appeal.

. . . .

THE COURT: Perhaps for the clarity of the record, Ms. Kaufman, would it surprise you to know that there are other reports from other agencies indicating positive or non-negative interactions with [the Father] and his children?

[MS. KAUFMAN:] I have no knowledge of what other agencies experience.

THE COURT: But would it surprise you that there were positive reports in relation to [the Father's] visitation time at other agencies?

[MS. KAUFMAN:] No, I wouldn't say it would surprise me, because like I said, he had some of those.

RP (July 26, 2024) at 527-29.

The Father contends the court erred when it declined to admit positive supervised visit reports from other agencies to impeach Ms. Kaufman. We disagree for two reasons. First, a "'witness[] cannot be impeached by statements of others for which [they are] not responsible and which have not been approved by [them].'" *State v. Johnson*, 90 Wn. App. 54, 64, 950 P.2d 981 (1998) (quoting *State v. Williams*, 79 Wn. App. 21, 27, 902 P.2d 1258 (1995)). Here, Ms. Kaufman was not responsible for drafting the supervised visit reports the Father sought to impeach her with. Thus, the court did not err by excluding them.

Secondly, even if it was error for the court to exclude the Father's proffered exhibits, the error was not prejudicial. The Father, with help from the court, was able to elicit testimony from Ms. Kaufman that he had positive visits with his children and that it

16

would not surprise her if he had other positive visits with other agencies. Thus, even without his proffered exhibit, the court was aware that the Father had positive supervised visits with his children.

To the extent the Father argues his constitutional due process rights or right to present a defense were violated, we decline to address the issue. Since there was no error, his rights were not violated. Furthermore, even if there was error, the Father does not explain how an evidentiary error deprived him of his constitutional rights. The trial court did not err in excluding the Father's proffered evidence.

WHETHER THE TRIAL COURT JUDGE WAS BIASED AGAINST THE FATHER

The Father argues the trial court judge was biased against him and that the court's bias violated his rights to due process and equal protection. Because the trial court was not biased against him, his constitutional rights were not violated.

"Due process, the appearance of fairness doctrine and Canon [2.11] of the Code of Judicial Conduct . . . require a judge to disqualify himself if he is biased against a party or his impartiality may reasonably be questioned." *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996). However, there is a presumption that a judge performs his or her functions regularly and properly without bias or prejudice. *Kay Corp. v. Anderson*, 72 Wn.2d 879, 885, 436 P.2d 459 (1967); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 127, 847 P.2d 945 (1993). Thus, a party seeking to overcome that presumption must offer some kind of evidence of a judge's actual or potential bias. *Wolfkill Feed &*

*Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000); *Dominguez*, 81 Wn. App. at 329.

The Father argues the trial court was biased against him because it (1) threatened CR 11 sanctions against him, (2) refused to substantively rule on multiple hearsay objections, (3) subjected his evidence to "hyper-technical scrutiny" while admitting the Department's exhibits even though they contained hearsay, and (4) ignored his constitutional objections. Opening Br. of Appellant at 19. The Father cannot overcome the presumption that the trial court judge was not biased.

"It is well settled that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007). The trial court afforded the Father an impartial and neutral hearing devoid of unfairness. As to his first claim, the court did warn the Father that if he "continue[d] to miscite to the laws for the purposes of making nonevidentiary objections, the Court will have to consider whether any form of CR 11 or other sanctions are applicable, potentially." RP (July 26, 2024) at 508. This warning came after the Father made objections based on "[d]efamation of character" and "CR 60(b) . . . [m]aliciously retained to the record." RP (July 26, 2024) at 507-08. The court advised the Father to "please be sure that your objections are related to appropriate objections." RP (July 26, 2024) at 508. The court recognized that "there are barriers and that it is difficult when you are unrepresented," and reminded the Father that "you are held to the same standard

as a lawyer." RP (July 26, 2024) at 508-09. In response, the Father argued with the trial court about his status as pro se and being held to the same standard as an attorney. The record reflects the trial court was extraordinarily patient with the Father despite his repeated objections without any basis in law. The trial court's warning that he would be sanctioned if his behavior continued did not demonstrate bias.

The Father next claims the trial court failed to rule on his hearsay objections. He points to his hearsay objection to the admission of the UIR (exhibit P-5). As discussed above, the Father failed to raise a hearsay objection to the admission of the UIR. To the extent the Father argues the trial court was biased because it did not admit his "impeachment materials," that argument fails for the same reasons. Again, as discussed above, the exhibit or exhibits he sought to use to impeach Ms. Kaufman were not admissible for that purpose.

Finally, the Father argues the trial court's failure to rule on his constitutional claims demonstrated bias. He points to a portion of the report of proceedings, pages 507-510, and claims the court "disregard[ed his] constitutional confrontation objections." Opening Br. of Appellant at 19, 21. That segment reflects that the Father objected to Ms. Kaufman's testimony on the basis of "defamation of character," "[m]isstating or quoting an individual that is present and currently able to dispute and to challenge to credibility of the claim," and "CR 60(b) subpart—or 2 subpart (b), CR 60. Maliciously

19

retained to the record." RP (July 26, 2024) at 507-08. The Father fails to point to any place in the record where the trial court refused to rule on a constitutional claim.

In sum, the Father is unable to show the trial court demonstrated hostility toward him or was otherwise biased. In contrast, the record reflects that the judge was patient with the Father and that he was afforded substantial latitude during trial. Because the trial court was unbiased and the Father received a fair, albeit imperfect hearing, the Father's constitutional rights were not violated.

### WHETHER THE FATHER'S RIGHT TO CONFRONT WITNESSES AND RIGHT TO DUE PROCESS WERE VIOLATED

Finally, the Father claims that his right to confront witnesses and his right to due process were violated because the Department failed to call Detective Austin to testify at trial. Specifically, the Father complains that the Department's decision not to call Detective Austin as a witness deprived him of his opportunity to cross-examine her thereby violating his constitutional rights. The Department responds that the confrontation clauses of the Washington and United States Constitutions do not apply to civil proceedings and that his right to due process was not violated. We agree with the Department.

Detective Austin was listed by the Department as a witness but, at trial, the Department "indicated they're not going to be calling [her]." RP (July 26, 2024) at 549. The Father "object[ed] to that" and stated he wanted "that witness to be called." RP (July

26, 2024) at 549. The court advised him that he was "welcome to call that witness if [he] would like." RP (July 26, 2024) at 550. The Father stated later at trial that he "contacted law enforcement to try to get [Detective] Austin to testify" but was ultimately unable to procure her as a witness. RP (July 26-29, 2024) at 646.

First, the Father argues his right to confront adverse witnesses was violated. Dependency proceedings are civil in nature. *See In re Dependency of Grove*, 127 Wn.2d 221, 226, 897 P.2d 1252 (1995). The confrontation clauses of the federal and state constitutions do not apply to dependency proceedings "since by their terms they . . . apply only in criminal cases." *In re Dependency of Penelope B.*, 104 Wn.2d 643, 650, 709 P.2d 1185 (1985). Thus, because the Father's right to confront adverse witnesses was not implicated, it was not violated.

Next, the Father argues his right to due process was violated because the Department's decision to strike Detective Austin as a witness "[a]llowed the State to selectively avoid unfavorable testimony while simultaneously enforcing procedural burdens against a pro se litigant." Opening Br. of Appellant at 27. Our Supreme Court "has rejected claims that the State's failure to call certain witnesses violate[s] a defendant's rights." *State v. Bell*, 26 Wn. App. 2d 821, 846, 529 P.3d 448 (2023). Though he attempted to procure Detective Austin as a witness *during* trial, the Father made no attempt to subpoena his own witnesses for the hearing prior to trial. His due

process rights were not violated because the Department declined to call one of its

witnesses to testify at trial.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.